**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**NORTHERN DIVISION**

| | |
|---|---|
| **MARTIN J. COBB,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | )          **Case No. 2:13cv0115 TCM** |
| | ) |
| **CAROLYN W. COLVIN, Acting** | ) |
| **Commissioner of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM AND ORDER

This action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the final decision of Carolyn W. Colvin, the Acting Commissioner of Social Security (the Commissioner), denying Martin J. Cobb's applications for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433, and for supplemental security income (SSI) under Title XVI of the Act, 1381-1383b, is before the undersigned by written consent of the parties. See 28 U.S.C § 636(c).

## Procedural History

Martin J. Cobb (Plaintiff) applied for DIB and SSI in August 2010, alleging that he became disabled on May 31, 2009, because of bipolar disorder, back problems, and arthritis in the knees. (R.[1] at 129-41, 161.)  His applications were denied initially and after an administrative hearing held in June 2012 before administrative law judge (ALJ) Dina Loewy.

---

[1]References to "R." are to the administrative record filed by the Commissioner with her answer.

(Id. at 9-20, 25-70, 72-77.) After considering additional evidence, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, effectively adopting that decision as the final decision of the Commissioner. (Id. at 1-6.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, and Bob Hammond testified at the administrative hearing.

Plaintiff testified that he was then thirty-six years of age, is 6 feet 2 inches tall, and weighs 235 pounds. He is not married. He lives with his mother and his three children, ages twelve, fourteen, and sixteen. (Id. at 30-31.) He has 150 hours of college credit in paralegal studies, but has not yet earned a degree. He last attended college classes in March 2010. (Id. at 32-33.)

Plaintiff was fired from and/or had problems with his previous jobs because of physical or verbal altercations with his bosses or coworkers. (Id. at 58-59.) He was fired from his last job, at Applebee's, because of a verbal dispute he had with his boss. (Id. at 34-35.)

Plaintiff has been diagnosed with schizoaffective disorder and bipolar disorder, for which he takes Lithium, Seroquel, and Effexor. (Id. at 37, 40.) He was first diagnosed with schizophrenia in 2006 when he was admitted to a psychiatric hospital. He was prescribed Abilify, but experienced an adverse reaction to the medication. He was then referred to Dr. William Irvin, a psychiatrist, who also diagnosed Plaintiff with schizophrenia and prescribed

him antidepressants and Ativan.  Over the next few years, Dr. Irvin prescribed different medications to achieve the best balance, resulting in Plaintiff being prescribed Lithium and Seroquel.  (Id. at 43-47.)

Plaintiff testified that he was medically discharged from the military in February 2008 because of schizophrenia and that he was hospitalized in March 2008 for homicidal and suicidal tendencies, resulting in the medication dosages being increased.  (Id. at 37, 45.) Plaintiff moved in 2010, at which time he began seeing Dr. Spalding on Dr. Irvin's recommendation.  He was hospitalized in May 2012 for suicidal thoughts and for cutting himself; again, his medication dosages were increased.  (Id. at 45-47.)

A nurse practitioner who works with Dr. Spalding, Carol Greening, currently prescribes Plaintiff's medications.  He sees her approximately once a month.  (Id. at 37-38, 40.) Plaintiff testified that the medication helps, but he continues to have spells during which he experiences a lot of confusion, a cloudy mind, weakness, and hampered decision-making. He has these spells approximately four days a week, and is basically chair- or bed-ridden when he does.  (Id. at 38-39, 52.)  Also, Plaintiff experiences medication side effects, including dizziness, confusion, sleepiness, and an inability to complete tasks.  The medication affects his kidneys, leading to occasional toxicity in his system that causes weakness and tremors.  (Id. at 40-42.)

Plaintiff testified that he experiences daily episodes of mania, during which time he has a racing heart, rapid breathing, shaky hands, extreme energy and strength, and tingling.

He tries to fight these feelings, but such resistance leads to anxiety and panic attacks. (Id. at 56.) When angry, Plaintiff cannot control his temper. He has no control over his episodes. (Id. at 60.) Plaintiff struggles with depression every day; this interferes with his ability to have healthy relationships with people other than his children.

Plaintiff's mother helps with his children, gets them ready for school, prepares their meals, and takes them to sporting events and different activities. Plaintiff sometimes goes to his children's events or activities, but usually stands back and away from other people. Plaintiff explained that he moved to the country in order to isolate himself. His nearest neighbor is two miles away. (Id. at 57-58.)

Plaintiff sees shadowy figures that others do not see and hears things such as voices, footsteps, or singing, that others do not. The voices sometimes tell him to isolate himself. He never knows when the voices will come; this uncertainty makes him constantly nervous. (Id. at 52-54.)

Plaintiff also experiences sleeplessness every night. He often goes three days without sleep. Such episodes occur approximately once a month and are followed by irrational thoughts, hallucinations, and self-mutilation. (Id. at 54-55.)

Plaintiff further testified, however, that he takes medication that helps him sleep through the night. If he dreams, he struggles for a few days trying to distinguish between the dream and reality. (Id. at 58.)

Plaintiff also has arthritis in his back, knees, wrists, and elbows.  He was previously diagnosed with herniated discs, slipped vertebrae, and scoliosis.  He takes over-the-counter Tylenol as well as Ultracet for pain.  (Id. at 50-51.)  He also takes medication for blood pressure and cholesterol.  (Id. at 37-38.)

Describing his exertional abilities, Plaintiff testified that he can stand for about half an hour, walk for about half an hour, and lift about ten pounds.  (Id. at 51.)  Because of his back pain, he needs to change positions about every fifteen minutes.  He cannot bend, squat, or stoop and get back up without pain.  (Id. at 61.)

Describing his daily activities, Plaintiff testified that he wakes up and "just kind of hang[s] out at home."  He may run errands or pick up his children from a friend's house.  (Id. at 47.)  His driver's license is suspended until he pays a speeding ticket.  (Id. at 31.)  Plaintiff enjoys hunting, watching his children play, watching television, and reading books.  He occasionally mows the lawn.  He has one friend.  He goes to the grocery store only once a month because he gets nervous and has panic attacks while he is there.  His children do the household chores as a way for them to learn responsibility.  (Id. at 49-50.)  Plaintiff testified that he lies down during the afternoon for about an hour because he is mentally and physically drained.  (Id. at 60-61.)

Mr. Hammond, a vocational expert, classified Plaintiff's past job[2] as a welder as medium with a specific vocational preparation (SVP) level of 5, as a waiter's helper as medium and with an SVP level of 2, and as a landscaper as medium with an SVP level of 3. (Id. at 66-67.)

Anticipating the receipt of additional medical evidence, the ALJ determined to reconvene the hearing with the vocational expert at a later date. No additional questions were posed to the vocational expert; no additional hearing was held. (Id. at 61-63, 67-68.)

## Medical Evidence Before the ALJ

The earliest medical record before the ALJ is of Plaintiff's May 2008 visit to Dr. Irvin for medication management. His medications then included Cymbalta and Ativan. His mood was good, but he was episodic. Plaintiff reported that his wife had filed for a restraining order against him that week. On examination, Plaintiff was well-groomed with a logical and sequential flow of thought and a regular rate and rhythm to his speech. Dr. Irvin noted that Plaintiff tolerated his medication well and had no side effects. His goal was to keep his mood stable. He was diagnosed with bipolar disorder and was continued on his medications. (Id. at 245.) Plaintiff failed to appear for his next two scheduled appointments. (Id. at 244.)

Plaintiff returned to Dr. Irvin on June 20, reporting that he was sleeping well with Ambien. His mood was up and down. He was experiencing some sadness and had been

_____

[2]Plaintiff's Job History Report indicates he was in the military from October 2007 to July 2008. In 2008, he worked as a welder and, briefly, as a landscaper. From August 2008 to May 2009, Plaintiff worked as a waiter's helper at a restaurant. (Id. at 162.)

really depressed.  He denied any suicidal or homicidal ideation, and he did not exhibit any psychosis.  Socially, Plaintiff was noted to have decreased self-esteem.  On examination, Plaintiff was calm and stable, well dressed, and groomed.  His speech was at a regular rate and rhythm; his flow of thought was logical and sequential.  Dr. Irvin noted that Plaintiff's dosage of Cymbalta had already been increased.  Plaintiff was continued on his other medications.  As before, Plaintiff's goal was optimizing and stabilizing his mood.  (Id. at 242.)

In July, Plaintiff reported to Dr. Irvin that he was doing alright but had been depressed for three weeks.  He sees his ex-wife, and was considering moving.  He denied having any suicidal or homicidal ideations, any suspicions, and any auditory or visual hallucinations.  His mental status examination was normal in all respects.  His diagnoses and medications were unchanged.  (Id. at 241.)

At his next, August visit to Dr. Irvin, Plaintiff said he was doing okay, was coping well with his circumstances, had a stable and good mood, and was sleeping well with the Ambien.  He denied any suicidal ideation.  His mental status examination continued to be normal in all respects.  He was continued on his medications.  (Id. at 240.)

Plaintiff called Dr. Irvin in September, reporting that he was having several side effects with Cymbalta.  Dr. Irvin instructed him to discontinue the Cymbalta and prescribed Wellbutrin.  (Id.)  Plaintiff reported in October that he had been off of his antidepressants for days and was not depressed.  Plaintiff was cautioned about the risk of relapse when not

taking his medication. As before, Plaintiff's mental status examination was normal. He was noted to be stable. (Id. at 239.)

Plaintiff returned to Dr. Irvin in January 2009 and reported that things had been alright and his mood had been stable and good. Lithium was working; Plaintiff no longer got upset about things. His sleep was fair with medication, which included Lorazepam and Ambien. His mental status examination was normal. He was to discontinue the Ambien. (Id. at 238.)

In April, Plaintiff reported to Dr. Irvin that he was "kind of depressed lately." His sleep and energy were poor; his medication was too expensive. Plaintiff was noted to be dysthymic. He was to restart Ambien and Cymbalta. (Id. at 235.)

Plaintiff next saw Dr. Irvin in June, reporting that he was "hanging in there" and his mood was good. His sleep was not good. He slept about three hours at night unless he took Ambien with Ativan. He was having mild panic symptoms. Restoril was prescribed. (Id. at 233.)

In September, Plaintiff reported to Dr. Irvin that he was doing okay and was not having problems with his ex-wife. His sleep and appetite were good, and his anger was decreased. Plaintiff denied any suicidal ideations. His mental status examination was normal. Plaintiff was continued in his diagnosis of bipolar disorder and on his medications of Restoril, Lithium, Ativan, and Cymbalta. (Id. at 229.)

Plaintiff returned to Dr. Irvin in February 2010. His mood was good, but he continued to have difficulty falling asleep. Plaintiff was advised to try Ativan for sleep. Plaintiff

denied any manic symptoms or any suicidal ideations. As before, his mental status examination was normal and he was continued on his medications. (Id. at 227.)

Six months later, in August, Dr. Irvin noted that Plaintiff's condition was under good control. No changes were made to his medications. His treatment goal was to "keep remission." (Id. at 226.)

Three weeks later, Plaintiff saw Connie Dochterman, a family nurse practitioner at Canton LaGrange Family Practice, for his complaints of back pain. He reported he had had intermittent pain for years and had felt his back "go" when he was pulling a riding mower from a ditch. Aspirin and rest helped relieve the pain, which was a five on a ten-point scale. On examination, Plaintiff had moderate and generalized tenderness about the thoracic spine with muscle spasticity. Plaintiff was prescribed Naproxen and Flexeril. X-rays were ordered. (Id. at 255-56.)

In October, Barbara Markway, Ph.D., a psychological consultant with disability determinations, completed a Psychiatric Review Technique Form (PRTF) in which she opined that Plaintiff's bipolar disorder was not severe. Although noting that there was insufficient evidence, Dr. Markway specifically opined that Plaintiff had no limitations in activities of daily living and mild limitations in maintaining social functioning and in maintaining concentration, persistence, or pace. He had not experienced any episodes of decompensation of extended duration. (Id. at 257-67.)

Plaintiff returned to Ms. Dochterman in December, and reported having a depressed mood, poor sleep, and irritability. His psychiatric history included schizophrenia, depressive disorder, and bipolar disorder. He explained that he had previously been treated in St. Louis before he moved, and he was seeking a referral for local care. His mental status examination was normal, as was his attention span, concentration, speech, and language. He had an appropriate mood and affect. He was referred for psychiatric care. (Id. at 377-78.)

Plaintiff visited Dr. Arvin Abueg at Canton LaGrange Family Practice on January 7, 2011, and was noted to have recent abnormal blood test results possibly related to his use of Lithium and Seroquel. Plaintiff reported feeling fine on his medications. His mania and depression were controlled. Plaintiff denied any hallucinations and any suicidal ideations or attempts or homicidal ideations. He also reported having back and muscle pain for which he took Flexeril and Naproxen. Physical and neuropsychiatric examinations were normal. He had a normal attention span and concentration, and had no impairment of memory. Plaintiff was diagnosed with bipolar disorder, stable on medication; secondary diabetes mellitus, probably secondary to Seroquel; and impaired renal function, with noted Lithium therapy. He was instructed to decrease carbohydrates and his dosage of Naproxen. Further laboratory testing was ordered. (Id. at 374-76.)

On January 12, on Ms. Dochterman's referral, Plaintiff consulted Carolyn Greening, a clinical nurse specialist at Hannibal Regional Medical Center Mental Health, for a psychiatric evaluation. Plaintiff complained of symptoms associated with schizophrenia and

bipolar disorder. His medical history included diagnoses of chronic schizoaffective disorder/bipolar type and phobias associated with dark places. His current medications included Naproxen, Lithium, Lorazepam, and Seroquel. Plaintiff reported that he had difficulty falling asleep and that he took all his Lorazepam at bedtime. Plaintiff also reported a history of paranoia and auditory hallucinations, and worried that he would hear or see things in the dark that would trigger another episode. Plaintiff complained of having intermittent thoughts of suicide but reported that he would never follow through because his three daughters needed him. Ms. Greening noted Plaintiff had a mild tremor, which was likely secondary to Lithium. On examination, Plaintiff was mildly depressed with anxiety; his affect was congruent with his mood; his thoughts were clear and logical; his intelligence was considered to be above average; his insight and judgment were appropriate; his memory, concentration, and attention were described as good. He displayed no evidence of psychosis, hallucinations, delusions, or suicidal ideations. Plaintiff was instructed to increase his dosage of Seroquel at bedtime and to take Lorazepam as ordered. (Id. at 352-53.)

Plaintiff returned to Ms. Greening on January 25, reporting that he was no longer having suicidal thoughts and that his mood had stabilized. He was sleeping well. His mental status examination was normal in all respects; his mood was stable; his affect congruent; his attention and concentration were good. Ms. Greening noted Plaintiff was more focused and calm. She considered Plaintiff's condition to have improved. He was to continue with his medications. (Id. at 350-51.)

On February 15, Ms. Greening completed a Mental Medical Source Statement (MMSS), listing Plaintiff's diagnosis as schizoaffective disorder/bipolar type. She opined that Plaintiff was mildly limited in his ability to understand, remember, and carry out simple instructions and to make judgments on simple work-related decisions. He was moderately limited in his ability to understand and remember complex instructions and was markedly limited in his ability to carry out complex instructions and to make judgments on complex work-related decisions. Ms. Greening explained that Plaintiff had a long history of mental health issues and had difficulty remembering and following through with instructions. Ms. Greening further explained that Plaintiff believed that others criticized him, especially supervisors, and that he had been unable to keep several jobs because he feared others were plotting against him. She assessed him as being moderately limited in his ability to interact appropriately with the public and markedly limited in his ability to interact appropriately with coworkers, respond to usual work situations, and respond to changes in a routine work setting. Because of his paranoia, he was extremely limited in his ability to interact appropriately with supervisors. She explained that Plaintiff felt that he was being picked on, criticized, made fun of, put down, and questioned about his abilities. She further explained that Plaintiff was suspicious of others and had a history of auditory hallucinations as well as suicidal and homicidal ideations. Plaintiff also had a history of mania as demonstrated by being up for several days, having difficulty staying on task, and having poor impulse control. She described Plaintiff as being severely fearful of the dark and having difficulties sleeping

due to anxiousness and worry. She reported that Plaintiff's disability began in May 2009. (Id. at 269-71.)

The following week, Plaintiff saw Ms. Greening and reported that he was doing okay. He had had several panic attacks two weeks earlier; the attacks were associated with an ear infection. His anxiety had improved, but he was experiencing some sadness due to an aunt's death. He was less afraid in the dark and was sleeping well. His mental status examination was unremarkable. Ms. Greening described Plaintiff's condition as improved, and instructed him to continue on his medications. (Id. at 348-49.)

Plaintiff next saw Ms. Greening in April, reporting that he was "not too bad." Some obsessive behaviors were noted with Plaintiff writing down medications and other information on a daily basis. He also reported having "all or nothing thinking." He was not sleeping well and was taking additional Xanax at bedtime in order to fall asleep. He was encouraged to take his medications as prescribed. Plaintiff reported that Seroquel was more effective in treating his mood swings. His mood was stable; his mental status examination was normal in all respects. He was instructed to increase his night-time dose of Seroquel. (Id. at 346-47.)

In May, Plaintiff reported to Ms. Greening that he was doing alright and that his medications effectively treated his symptoms without causing any side effects. He reported having a long history of paranoia in that he does not trust many people. It was noted that Plaintiff stayed busy with children and the farm. On examination, Plaintiff was mildly

anxious but was otherwise unchanged. Ms. Greening described Plaintiff's condition as "stable for patient." He was to continue on his medications. (Id. at 344-45.)

Ms. Greening wrote "To Whom It May Concern" on June 11 that Plaintiff was currently receiving outpatient mental health treatment on a monthly basis and was not able to work because of his mental health issues. (Id. at 281.)

Two days later, Plaintiff reported to Ms. Greening that he had been seeing dark figures again during the day. He denied symptoms of depression but reported occasional mild anxiety. He was sleeping fairly well. Ms. Greening noted that Plaintiff experienced several stressors, i.e., he worked on the family farm for his father, helped his mother, and was the main caregiver to his children. His mental status examination revealed a stable mood but mild paranoia. Plaintiff was diagnosed with increased stress and psychosis and was instructed to increase his Seroquel. Ms. Greening rated his Global Assessment of Functioning (GAF) as 56.[3] (Id. at 342-43.)

On July 15, Dr. Abueg reviewed recent lab results and diagnosed Plaintiff with diabetes mellitus, likely secondary to Seroquel increase; hyperlipidemia, secondary to medications; and acquired hypothyroidism, side effect of Lithium. (Id. at 370-71.)

---

[3]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th Ed. Text Revision 2000) [DSM-IV-TR], the [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning,'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010). A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34 (emphasis omitted).

Five days later, Plaintiff reported to Ms. Greening that his mood had been fairly stable. He showed no psychosis on examination. His GAF score was 69.[4] Ms. Greening noted that Plaintiff recently had abnormal lab results and that there was a possibility that his medications were causing him to develop diabetes, kidney disease, and thyroid disease. Plaintiff reported his medications to be effective but understood there was potential for long term side effects. Plaintiff was instructed to taper Seroquel. Loxitane was prescribed. (Id. at 339-41.)

No changes were noted when Plaintiff returned to Ms. Greening on August 1. His mood was stable; his mental status examination was normal in all respects. He reported having no mood swings and no side effects from medications. Plaintiff was instructed to continue to taper Seroquel and to increase the Loxitane dosage at bedtime. (Id. at 337-38.)

Two weeks later, Plaintiff reported to Ms. Greening that he felt restless, was increasingly anxious, and had difficulties sitting still and falling asleep. She opined that Plaintiff was experiencing extrapyramidal symptoms (EPS) as a side effect of increasing the Loxitane. Except for those symptoms, his mental status examination was normal. A GAF score of 70 was assigned. Plaintiff was instructed to decrease his Loxitane and to continue taking Seroquel at bedtime. (Id. at 335-36.)

---

[4]A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV-TR at 34 (emphasis omitted).

When he next saw Ms. Greening, on August 31, Plaintiff continued to report problems with sitting still. Mild akathisia was noted. Propranolol was added to Plaintiff's medication regimen. His GAF score was again 70. (Id. at 333-34.)

Plaintiff returned to Ms. Greening on September 27. He was feeling more depressed, had a low energy level, and lacked interest in activities. Plaintiff reported some anxiety, restlessness, and muscle tightness. On examination, his mood was depressed and his affect bland. No abnormal movement was noted. Ms. Greening diagnosed Plaintiff with an increase in depression with mild anxiety. She rated his GAF score as 67 and prescribed him venlafaxine (the generic form of Effexor) and, after consulting Dr. Spalding, Zolpidem. (Id. at 331-32.)

The next month, Ms. Greening described Plaintiff's mood as being less depressed. Plaintiff reported that his mood was lifting, he was more upbeat, and he had more good days than bad days. He did not have any symptoms of mania. His mental status examination was remarkable; his GAF was unchanged. He expressed concern about first Dr. Spalding and then his primary care doctor lowering his dosage of Lithium. (Id. at 329-30.)

Plaintiff returned to Ms. Greening in November, reporting that he was doing better. His mood had lifted, his anxiety had lessened, and his sleep had improved. He further reported that he was experiencing mild paranoia around strangers. Mental status examination revealed that he could become paranoid around others, but was otherwise unremarkable. His current GAF was 70. His current medications included Lithium, Lorazepam, Seroquel,

Propranolol, venlafaxine, and Zolpidem. Ms. Greening noted that Plaintiff's lab results had returned to normal since he reduced his Seroquel dosage. His prescriptions were unchanged. (Id. at 327-28.)

At his next, January 2012, visit, Plaintiff told Ms. Greening that he was not doing too badly, had no more symptoms of depression, was sleeping fairly well, and was not having any side effects from his medications. He had started dating again. His mental status examination was normal. His GAF was unchanged. Ms. Greening described his status as "stable for patient." (Id. at 325-26.)

In February, Plaintiff consulted Dr. Abueg for complaints of an acute onset of hip pain that worsened throughout the day with walking. He also complained of continuing moderate back pain that worsened with lifting, bending, and twisting and was relieved with rest and acetaminophen. On examination, Plaintiff had mild tenderness about his thoracic and lumbosacral spine and spinal column, a full range of motion, normal reflexes, negative straight leg raises, and tenderness and pain about the hips. Plaintiff was diagnosed with lumbago and prescribed Naproxen. He was also diagnosed with iliotibial band syndrome and instructed to bend his knees when carrying heavy loads. (Id. at 354-65.)

Two months later, Plaintiff reported to Ms. Greening that he had had a couple of "rough times" when he was more irritable and wanted to hurt someone. Cutting on his arm felt good and took his feelings away. He was having sleeping difficulties and was dreaming more. He had had a few panic attacks, but had been able to work through his symptoms.

Plaintiff was compliant with his medications. He was assigned a GAF score of 62 and continued on his medications. (Id. at 322-24.)

Plaintiff was admitted to Blessing Hospital on May 1 with complaints of feeling suicidal after arguing with his mother about money. Plaintiff denied ever having clear manic or hypermanic episodes, but reported having episodes when he became angry, irritable, or stressed. He further reported having occasional visual hallucinations when by himself at night, but no auditory hallucinations, paranoia, or delusions. Plaintiff was admitted. He was given Effexor, and his other medications were adjusted. During the course of his hospitalization, his depression significantly improved and his suicidal thoughts "completely disappeared." He was discharged on May 7 in stable condition with discharge diagnoses of mood disorder and personality disorder and a GAF of 50.[5] (Id. at 392-96.)

On May 22, Plaintiff returned to Ms. Greening and reported that he was not suicidal anymore and had stopped cutting himself. She noted both that he was not having any hallucinations and that "voices are more bothersome since the Seroquel was reduced." He also reported that he had recently become shaky, nauseated, and sick while working outside. Ms. Greening noted the possibility of Lithium toxicity and advised Plaintiff to drink fluids. His mental status examination was normal in all respects. His mood was stable, but he had

---

[5]A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34 (emphasis omitted).

"problems with thoughts." His GAF score was 68. He was to increase his Seroquel dosage. (Id. at 319-21.)

Two days later, Ms. Greening wrote in an addendum to her February 2011 MMSS that Plaintiff continued to experience thoughts of suicide and was recently hospitalized for suicidal thoughts with a plan. He could be hostile to others if he believed they were challenging him; for instance, he had a history of physically assaulting a boss. He was compliant with treatment but did not tolerate stress well and would need long term treatment. Ms. Greening opined that Plaintiff was permanently disabled and could not be employed. (Id. at 283-86.)

Plaintiff followed up with Dr. Abueg in June for complaints of moderate renal insufficiency due to several factors, including Lithium use and chronic use of non-steroidal anti-inflammatory drugs for pain. His Lithium dose was to be adjusted by his psychiatrist. (Id. at 362-63.)

## The ALJ's Decision

The ALJ first found that Plaintiff had not engaged in substantial gainful activity since his alleged disability onset date of May 31, 2009. She next found that he had severe impairments of arthritis and psychological conditions, variably diagnosed as depression, anxiety, and schizoaffective disorder, but did not have an impairment or combination of impairments that met or medically equaled an impairment of listing-level severity.

Addressing Plaintiff's residual functional capacity (RFC), the ALJ found that Plaintiff could lift and carry fifty pounds occasionally and twenty-five pounds frequently and could sit, stand, and walk for six hours each. Plaintiff was limited, however, to simple, routine, and repetitive tasks with only occasional decision making or changes in the work setting. The ALJ further found that Plaintiff could no more than occasionally interact with the public and coworkers, and that his work should be isolated with only occasional supervision. The ALJ then determined that Plaintiff's RFC did not preclude the performance of his past relevant work as a waiter's helper. Plaintiff was not, therefore, disabled within the meaning of the Act. (Id. at 16-20.)

## Medical Evidence Submitted to Appeals Council

After the ALJ rendered her decision, Plaintiff submitted to the Appeals Council a report of a December 2012 CT scan of the abdomen and pelvis taken to investigate his complaints of flank pain.[6] The scan revealed grade II spondylolisthesis at L5-S1 with associated bilateral spondylosis, a slight thickening of the urinary bladder wall, and right renal scarring. There was no evidence of renal or ureteral calculi. (Id. at 399-400.)

## Discussion

To be eligible for DIB and SSI under the Act, Plaintiff must prove that he is disabled.

**Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2001); **Baker v. Secretary of Health**

---

[6]The Appeals Council having considered this additional evidence, the Court must also consider it when determining whether the ALJ's decision is supported by substantial evidence on the record as a whole. See **Frankl v. Shalala**, 47 F.3d 935, 939 (8th Cir. 1995); **Richmond v. Shalala**, 23 F.3d 1441, 1444 (8th Cir. 1994).

**& Human Servs.**, 955 F.2d 552, 555 (8th Cir. 1992).  The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process.  See 20 C.F.R. §§ 404.1520, 416.920; **Bowen v. Yuckert**, 482 U.S. 137, 140-42 (1987).  The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If the claimant is working, disability benefits are denied.  Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits his ability to do basic work activities.  If the claimant's impairment(s) is not severe, then he is not disabled.  The Commissioner then determines whether claimant's impairment(s) meets or equals one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1.  If claimant's impairment(s) is equivalent to one of the listed impairments, he is conclusively disabled.  At the fourth step, the Commissioner establishes whether the claimant can perform his past relevant work.  If so, the claimant is

not disabled.  Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy.  If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); **Richardson v. Perales**, 402 U.S. 389, 401 (1971); **Estes v. Barnhart**, 275 F.3d 722, 724 (8th Cir. 2002).  Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion.  **Johnson v. Apfel**, 240 F.3d 1145, 1147 (8th Cir. 2001).  This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings."  **Coleman v. Astrue**, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted).  "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis."  **Id.** (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.    The credibility findings made by the ALJ.

2.    [P]laintiff's vocational factors.

3.    The medical evidence from treating and consulting physicians.

4.    [P]laintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.      Any corroboration by third parties of [P]laintiff's impairments.

6.      The testimony of vocational experts when required which is based upon
a proper hypothetical question which sets forth the claimant's impairment.

**Stewart v. Secretary of Health & Human Servs.**, 957 F.2d 581, 585-86 (8th Cir. 1992)

(internal citations omitted).  The Court must also consider any evidence which fairly detracts

from the Commissioner's decision.  **Coleman**, 498 F.3d at 770; **Warburton v. Apfel**, 188

F.3d 1047, 1050 (8th Cir. 1999).  However, even though two inconsistent conclusions may

be drawn from the evidence, the Commissioner's findings may still be supported by

substantial evidence on the record as a whole.  **Pearsall**, 274 F.3d at 1217 (citing Young v.

Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)).  "[I]f there is substantial evidence on the record

as a whole, we must affirm the administrative decision, even if the record could also have

supported an opposite decision."  **Weikert v. Sullivan**, 977 F.2d 1249, 1252 (8th Cir. 1992)

(internal quotation marks and citation omitted); see also **Jones ex rel. Morris v. Barnhart**,

315 F.3d 974, 977 (8th Cir. 2003).

Plaintiff argues that ALJ's decision is not supported by substantial evidence on the

record on a whole.  Specifically, Plaintiff challenges the manner by which the ALJ

determined his RFC, including the method by which the ALJ assessed his credibility and the

little weight she gave Ms. Greening's opinions.  Plaintiff also contends that, under the

circumstances of his case, the ALJ should have obtained an updated opinion from a medical

expert.  Finally, Plaintiff argues that the ALJ erred by finding him able to perform his past

relevant work and that, because of his non-exertional impairments, vocational expert

testimony should have been adduced. For the following reasons, the ALJ committed no legal error and her decision is supported by substantial evidence on the record as a whole.

RFC Determination. A claimant's RFC is the most he can do regardless of his physical or mental limitations. **Masterson v. Barnhart**, 363 F.3d 731, 737 (8th Cir. 2004). The ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of his symptoms and limitations. **Goff v. Barnhart**, 421 F.3d 785, 793 (8th Cir. 2005); **Eichelberger v. Barnhart**, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. §§ 404.1545(a), 416.945(a). Because a claimant's RFC is a medical question, some medical evidence must support the ALJ's RFC determination. **Vossen v. Astrue**, 612 F.3d 1011, 1016 (8th Cir. 2010); **Eichelberger**, 390 F.3d at 591; **Hutsell v. Massanari**, 259 F.3d 707, 711-12 (8th Cir. 2001). Accordingly, the ALJ must "consider at least some supporting evidence from a [medical professional]" and should obtain medical evidence that addresses the claimant's ability to function in the workplace. **Id.** at 712 (internal quotation marks and citation omitted). An ALJ's RFC assessment which is not properly informed and supported by some medical evidence in the record cannot stand. **Id.**

In challenging the ALJ's RFC determination, Plaintiff disagrees with her assessment of his credibility. When determining a claimant's RFC, the ALJ must first evaluate the claimant's credibility. **Willcockson v. Astrue**, 540 F.3d 878, 880 (8th Cir. 2008); **Tellez v.**

**Barnhart**, 403 F.3d 953, 957 (8th Cir. 2005). In so doing, the ALJ must consider all evidence relating to the claimant's subjective complaints, including the claimant's prior work record and third party observations as to the claimant's daily activities; the duration, frequency and intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions. **Polaski v. Heckler**, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted); see also 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). When rejecting a claimant's subjective complaints, the ALJ must make an express credibility determination detailing her reasons for discrediting the testimony. **Renstrom v. Astrue**, 680 F.3d 1057, 1066 (8th Cir. 2012); **Cline v. Sullivan**, 939 F.2d 560, 565 (8th Cir. 1991). "It is not enough that inconsistencies may be said to exist, the ALJ must set forth the inconsistencies in the evidence presented and discuss the factors set forth in *Polaski* when making credibility determinations." **Id.**; see also **Renstrom**, 680 F.3d at 1066; **Beckley v. Apfel**, 152 F.3d 1056, 1059-60 (8th Cir. 1998). Where an ALJ explicitly considers the *Polaski* factors but then discredits a claimant's complaints for good reason, the decision should be upheld. **Hogan v. Apfel**, 239 F.3d 958, 962 (8th Cir. 2001); see also **Casey v. Astrue**, 503 F.3d 687, 696 (8th Cir. 2007). The determination of a claimant's credibility is for the Commissioner, and not the Court, to make. **Tellez**, 403 F.3d at 957; **Pearsall**, 274 F.3d at 1218.

Plaintiff first argues that the ALJ fatally erred in her credibility determination by failing to consider many of the factors required by 20 C.F.R. § 404.1529. Plaintiff does not,

however, identify which § 404.1529 factors the ALJ failed to address.  Regardless, his claim

fails.  **Polaski** and 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) set out identical factors for

an ALJ to consider when determining the credibility of a claimant's subjective complaints,

i.e., the claimant's prior work record and third party observations as to the claimant's daily

activities; the duration, frequency and intensity of the symptoms; any precipitating and

aggravating factors; the dosage, effectiveness and side effects of medication; and any

functional restrictions.  Here, the ALJ invoked *Polaski*, listed the factors, methodically

discussed the evidence of record as it related to each factor, and concluded that Plaintiff's

allegations were "minimally credible" given their inconsistency with the record.  (R. at

13-15.)  Plaintiff's cursory claim that the ALJ failed to discuss the required factors for

determining credibility is without merit.

To the extent Plaintiff also argues that the ALJ committed reversible error by failing

to mention Plaintiff's testimony in her credibility determination, this claim also is without

merit.  A review of the ALJ's decision, including her credibility determination, shows her to

have considered all the evidence of record, including medical records, third party

observations, and Plaintiff's subjective statements made at the administrative hearing and in

administrative paperwork.  The ALJ specifically noted that Plaintiff testified at the hearing

that his mental impairments caused confusion during the day; that he experienced numerous

side effects from his medications; and that his arthritis condition created problems with

sitting and standing.  The ALJ also noted evidence that Plaintiff mowed, shopped, hunted,

stayed busy with his children, and reported to his physicians that he saw dark figures – all of which Plaintiff testified to at the hearing. Plaintiff's cursory claim that the ALJ failed to consider any of his hearing testimony is without merit.

Finally, a review of the ALJ's credibility determination shows it to be supported by good reasons and substantial evidence on the record as a whole. Referring to the evidence of record as it relates to the credibility factors, the ALJ first noted Plaintiff's work history to favor his credibility. The ALJ then considered the nature of Plaintiff's daily activities – driving, homemaking, mowing, shopping, hunting, fishing, working on his father's farm, and keeping busy with his children – and found them not to be entirely consistent with his claims of work-related limitations. See e.g. **Buckner v. Astrue**, 646 F.3d 549, 558 (8th Cir. 2011) (caring for son and girlfriend, doing house cleaning and some yard work, leaving residence nearly every day and riding in car, going out alone, and shopping in stores inconsistent with disabling symptoms); **Roberson v. Astrue**, 481 F.3d 1020, 1025 (8th Cir. 2007) (caring for child, driving, fixing simple meals, housework, and shopping for groceries inconsistent with complaints of disabling symptoms); **Pelkey v. Barnhart**, 433 F.3d 575, 578 (8th Cir. 2006) (performing household chores, mowing the lawn, raking leaves, shopping for groceries, visiting with friends, and driving a car inconsistent with subjective complaints of disabling pain). With respect to Plaintiff's symptoms and treatment therefor, the ALJ noted that Plaintiff consistently exhibited normal behavior during numerous mental status examinations and that treatment notes reported very few signs of significant psychological problems. See

e.g., **Halverson v. Astrue**, 600 F.3d 922, 933 (8th Cir. 2010) (affirming ALJ's rejection of claimant's argument she was unable to work when multiple examinations showed no abnormalities). Indeed, Plaintiff's testimony that he experienced episodes of mania every day was inconsistent with his reports to his mental health providers that he never experienced such episodes. See **Ply v. Massanari**, 251 F.3d 777, 779 (8th Cir. 2001) (inconsistency in claimant's statements valid reason to discredit subjective complaints). While acknowledging the concern regarding Lithium toxicity, the ALJ noted that Plaintiff's medications helped his mental impairments without significant side effects. See **Roth v. Shalala**, 45 F.3d 279, 282 (8th Cir. 1995) (impairments that are controllable or amenable to treatment do not support a finding of disability). Notably, a review of the record shows that Plaintiff's provider counseled him only to drink fluids to counter the effects of Lithium, and an adjustment to Plaintiff's other medications alleviated their adverse effects. See e.g. **Perkins v. Astrue**, 648 F.3d 892, 901 (8th Cir. 2011) (medication side effects diminished by changes in medication or their dosages). Nevertheless, a review of the record shows any reported side effects did not affect Plaintiff's functional abilities. Further, Plaintiff's claimed side effects of dizziness, confusion, sleepiness, and inability to complete tasks (to which he testified) were never reported to any provider. Conversely, the record shows Plaintiff to have reported to his providers that he experienced no side effects from his medications. See e.g., **Richmond v. Shalala**, 23 F.3d 1441, 1443-44 (8th Cir. 1994) (ALJ did not err in credibility assessment of claimant who complained of medication side effects at hearing but, according to medical

records, did not report such to doctors). Finally, the ALJ noted that Plaintiff's complaints of physical limitations were inconsistent with the medical record that showed minimal physical symptoms with only a few objective signs of physical abnormalities, including some back tenderness and spasm in August 2010 and back tenderness in February 2012. See **Halverson**, 600 F.3d at 931-32 (ALJ may consider as one credibility factor lack of objective evidence supporting the subjective complaints).

Accordingly, in a manner consistent with and as required by *Polaski*, the ALJ considered Plaintiff's subjective complaints on the basis of the entire record and set out numerous inconsistencies that detracted from his credibility. Because the ALJ's determination not to credit Plaintiff's subjective complaints is supported by good reasons and substantial evidence, the Court defers to her determination. See **McDade v. Astrue**, 720 F.3d 994, 998 (8th Cir. 2013); **Renstrom**, 680 F.3d at 1065; **Goff**, 421 F.3d at 793.

Plaintiff next argues that the ALJ's credibility determination is flawed because she did not properly weight the opinions of Ms. Greening.

In evaluating opinion evidence, the Regulations require the ALJ to explain in the decision the weight given to any opinions from treating sources, non-treating sources, and non-examining sources. See 20 C.F.R. §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii). The Regulations require that more weight be given to the opinions of treating sources than other sources. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). A treating source's assessment of the nature and severity of a claimant's impairments should be given controlling weight if the

opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. 20 C.F.R. §§ 404.1527(c), 416.927(c); see also **Forehand v. Barnhart**, 364 F.3d 984, 986 (8th Cir. 2004). This is so because a treating source has the best opportunity to observe and evaluate a claimant's condition,

> since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

When a treating source's opinion is not given controlling weight, the Commissioner must look to various factors in determining what weight to accord the opinion, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, whether the treating physician provides support for her findings, whether other evidence in the record is consistent with the treating source's findings, and the treating source's area of specialty. 20 C.F.R. §§ 404.1527(c), 416.927(c). The Regulations further provide that the Commissioner "will always give good reasons in [the] notice of determination or decision for the weight [given to the] treating source's opinion." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

As noted above, Plaintiff contends that the ALJ erred by failing to accord controlling weight to the opinion of his treating source, Ms. Greening. Plaintiff's argument is misplaced.

"[O]nly 'acceptable medical sources' can be considered treating sources, whose medical opinions may be entitled to controlling weight."  Social Security Ruling (SSR) 06-3p, 2006 WL 2329939, at *2 (Soc. Sec. Admin. Aug. 9, 2006) (internal citations omitted).  See also 20 C.F.R. §§ 404.1502, 416.902; 20 C.F.R. §§ 404.1527(c), 416.927(c).  Nurse practitioners and physicians' assistants are not "acceptable medical sources" under the Regulations. 20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1).  While evidence from these "other sources" must be considered by the ALJ and weighed under §§ 404.1527(c), 416.927(c), the ALJ may not accord controlling weight to opinions from such other sources inasmuch as they are not "acceptable medical sources" and thus cannot be a "treating source."  See **Lacroix v. Barnhart**, 465 F.3d 881, 885-87 (8th Cir. 2006); SSR 06-3p, 2006 WL 2329939, at *4-5.  Accordingly, because Ms. Greening is not an acceptable medical source, the ALJ did not err in failing to accord controlling weight to her February 2011 MMSS or other opinions.

Nevertheless, the ALJ considered Ms. Greening's opinions and determined to accord them little weight.  Substantial evidence on the record as a whole supports this determination.  As an initial matter, the Court notes that a medical source's opinion that a claimant is disabled or unable to work is an issue reserved to the Commissioner and is not a medical opinion entitled to deference.  **Ellis v. Barnhart**, 392 F.3d 988, 994-95 (8th Cir. 2005).  Additionally, the ALJ noted that to the extent Ms. Greening opined that Plaintiff suffered limitations so extreme that he could not interact appropriately with coworkers or supervisors or respond appropriately to work situations, her observations during her treatment of Plaintiff

contradicted these assessments. Indeed, as noted by the ALJ, Ms. Greening repeatedly reported in her treatment records that Plaintiff was stable and had only isolated instances of being mildly depressed or showing mild paranoia. Further, as also noted by the ALJ, Ms. Greening rarely observed signs that reflected the extreme limitations as opined in her MMSS, and a review of the record shows any exacerbation in symptoms to be situational in nature and effectively treated with an adjustment to medication. Cf. **Gates v. Astrue**, 627 F.3d 1080, 1082 (8th Cir. 2010) (ALJ did not err in finding claimant's depression not to be severe inasmuch as it was situational in nature, related to marital issues, and improved with medication and counseling). Because neither the extreme limitations nor the debilitating symptoms expressed in Ms. Greening's February 2011 MMSS and its addendum are documented in any of her treatment notes, the ALJ did not err in according limited weight to her opinions. See **Reed v. Barnhart**, 399 F.3d 917, 921 (8th Cir. 2005) (ALJ permitted to discount medical source's opinions in MSS where limitations listed on the form stand alone and were never mentioned in numerous treatment records nor supported by objective testing or reasoning); see also **Teague v. Astrue**, 638 F.3d 611, 615 (8th Cir. 2011) (little evidentiary weight accorded to functional limitations set out in MSS check-off form because previous treatment notes did not report any significant limitations); **Halverson**, 600 F.3d at 930 (inconsistency between treating physician's treatment records and his functional assessment provides good reason for ALJ to discount physician's opinion).

Additionally, the Court notes that the opinions in Ms. Greening's February 2011 MMSS were given after Plaintiff had visited her on only two occasions. While Plaintiff subjectively reported symptoms during the first visit in early January 2011 that appear to be consistent with the opinions in the MMSS, Ms. Greening noted during the following visit on January 25 – the visit immediately preceding the completion of the MMSS – that Plaintiff was stable, exhibited a normal mental status examination in all respects, was focused and calm, and demonstrated good concentration and attention. See **Renstrom**, 680 F.3d at 1064 (treating physician's opinions given less weight where they are largely based on claimant's subjective complaints). Thereafter, Ms. Greening's treatment notes continue to reflect normal mental status examinations, only isolated exacerbations of mostly mild symptoms, and GAF scores consistent with mild limitations.

Nevertheless, the ALJ's RFC assessment contains significant functional limitations, including the limitation to simple, routine, and isolated work with only occasional interaction with the public, coworkers, and supervisors. Such limitations appear to be consistent with many of those described by Ms. Greening. It cannot be said, therefore, that the ALJ wholly failed to consider the opinion of Ms. Greening or that the RFC assessment is not supported by some medical evidence. See **Martise v. Astrue**, 641 F.3d 909, 926 (8th Cir. 2011); **Ellis**, 392 F.3d at 994. An ALJ is "not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians." **Martise**, 641 F.3d at

927 (internal quotation marks and citation omitted).  Instead, the ALJ must determine a

claimant's RFC based on her review of the record as a whole.  The ALJ did so here.

In his next, and final, challenge to the ALJ's RFC determination, Plaintiff contends

that by dismissing the opinion evidence from Ms. Greening and the opinion evidence from

Dr. Markway, the State agency consultant,[7] the ALJ left the record devoid of any evidence

upon which she could base her RFC assessment.  Again, Plaintiff's argument is misplaced.

The absence of *opinion* evidence does not undermine an ALJ's RFC determination where

other medical evidence in the record supports the finding.  See **Cox v. Astrue**, 495 F.3d 614,

619-20 (8th Cir. 2007); see also **Zeiler v. Barnhart**, 384 F.3d 932, 936 (8th Cir. 2004) (lack

of opinion evidence not fatal to RFC determination where ALJ properly considered available

medical and testimonial evidence).  Because sufficient medical evidence supports the ALJ's

RFC assessment, the ALJ did not err in her determination.

The ALJ thoroughly summarized all of the medical evidence of record and engaged

in a function-by-function analysis setting out the evidence that supported each conclusion

regarding Plaintiff's functional abilities.  (See R. at 17-18.)  With respect to Plaintiff's

physical limitations, the ALJ noted that the medical evidence showed only some tenderness

and spasms about the back with no limitations imposed with respect to lifting, carrying,

sitting, standing, or walking.  The ALJ further noted that the record showed normal

---

[7]The ALJ considered the PRTF completed by Dr. Markway but determined that the record
as a whole showed Plaintiff to experience mental limitations beyond those he described.  (See R. at
19.)

- 34 -

examinations with respect to such functional abilities. Indeed, the record shows Plaintiff to have full range of motion and normal gait and to have been instructed on how to lift heavy loads. Plaintiff neither exhibited nor complained of any postural limitations to his healthcare providers and, further, he engaged in activities demonstrating he was not limited beyond what was determined in the physical RFC.

With respect to Plaintiff's mental limitations, the ALJ noted that numerous mental status examinations repeatedly showed Plaintiff to be logical, alert, and oriented; to have good concentration, attention, and memory; and to be cooperative. The ALJ also noted that Plaintiff engaged in activities that required skills and abilities consistent with the RFC findings, and that to the extent Plaintiff was limited in such abilities – such as with interaction – these limitations were accounted for in the mental RFC.

The ALJ properly established Plaintiff's RFC based upon all the record evidence in this case, including medical and testimonial evidence. The record contains some medical evidence that supports the RFC, and substantial evidence on the record as a whole supports the determination. See **Casey**, 503 F.3d at 697; **Dykes v. Apfel**, 223 F.3d 865, 866-67 (8th Cir. 2000) (per curiam). While evidence in the record may also support a different conclusion, a reasonable person could find the evidence adequate to support the ALJ's decision and it must therefore be affirmed. **Gates**, 627 F.3d at 1082; see also **Owen v. Astrue**, 551 F.3d 792, 797-98 (8th Cir. 2008) (ALJ's decision not to be reversed if it falls within "available zone of choice").

Medical Expert Opinion.  When determining the severity of a claimant's mental impairment, the Regulations require the Commissioner to undergo a special technique whereby the Commissioner rates the degree of functional loss the claimant suffers as a result of the impairment in the areas of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.  See generally 20 C.F.R. §§ 404.1520a, 416.920a.

> When we rate the degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace), we will use the following five-point scale:  None, mild, moderate, marked, and extreme.  When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale:  None, one or two, three, four or more. . . .
>
> . . .
>
> If we rate the degree of your limitation in the first three functional areas as "none" or "mild" and "none" in the fourth area, we will generally conclude that your impairment(s) is not severe . . . .

20 C.F.R. §§ 404.1520a(c)(4)-(d)(1), 416.920a(c)(4)-(d)(1).  At the initial and reconsideration steps of the administrative process, the Commissioner must complete a standard document outlining the steps of this technique.  At the hearing and Appeals Council levels, application of the technique must be documented in the written decision.  20 C.F.R. §§ 404.1520a(e), 416.920a(e).  An ALJ may use the services of a medical expert to assist in applying the technique at the hearing level.  20 C.F.R. §§ 404.1520a(e)(5), 416.920a(e)(5).

Here, at the initial level of the administrative review process, Dr. Markway completed the PRTF as required by the Regulations and opined that Plaintiff's mental impairment, bipolar disorder, was not severe.  In her written decision, the ALJ considered this PRTF but

determined that the record as a whole showed Plaintiff to experience mental limitations beyond those opined in the PRTF. The ALJ documented her application of the special technique in her decision, see Record at 16-17, found Plaintiff's mental impairments did not meet a listed impairment, and formulated Plaintiff's RFC that included significant mental limitations. Plaintiff appears to contend that by discounting Dr. Markway's opinion, as well as opinion evidence from Ms. Greening, the ALJ formulated her own conclusions without the assistance of a medical expert as required by the Regulations. Plaintiff argues that, with the additional evidence received into the record subsequent to Dr. Markway's opinion, the ALJ should have obtained an updated opinion from a medical expert to assist in determining whether Plaintiff's mental impairments meet a listing.

Given the construction of the Listings of Impairments, an individual whose impairments meet or equal a listed mental impairment cannot reasonably be expected to do any gainful activity. See 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00A. The claimant bears the burden to prove that he meets or equals a listed impairment. **Carlson v. Astrue**, 604 F.3d 589, 593 (8th Cir. 2010) (citing Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004)). In determining whether a claimant's impairments medically equal a listing, the Regulations require the Commissioner to consider all the evidence of record regarding the impairments and their relevant effects on the claimant. 20 C.F.R. §§ 404.1526(c), 416.926(c). The Regulations also require the Commissioner to "consider the opinion given by one or more medical or psychological consultants designated by the Commissioner." 20

C.F.R. §§ 404.1526(c), 416.926(c); see also SSR 96-6p, 1996 WL 374180 (Soc. Sec. Admin. July 2, 1996). If, subsequent to the consultant rendering her opinion, additional medical evidence is received into the record that "in the opinion of the [ALJ]" may change the consultant's finding that the impairment(s) is not equivalent to a listed impairment, the ALJ must obtain an updated opinion. SSR 96-6p, 1996 WL 374180, at *3-4.

In this case, the ALJ considered all the evidence of record regarding Plaintiff's mental impairment and its relevant effects and determined Plaintiff's mental limitations, while severe, not to be so severe as to preclude all gainful activity. As discussed above, the ALJ's RFC assessment, which included significant mental limitations, is supported by substantial evidence on the record as a whole. Given the ALJ's thorough review of all the evidence of record, including the PRTF and the evidence received subsequent thereto, and her determination therefrom that Plaintiff's mental impairment did not meet a listed impairment, it is evident that she was not of the opinion that the additional medical evidence received after the PRTF could change the consultant's finding that Plaintiff's mental impairment did not equal a listed impairment. The ALJ was thus not required to obtain an updated medical expert opinion.

Past Relevant Work. At the administrative hearing, the ALJ elicited testimony from the vocational expert with respect to the exertional and skill level classifications of Plaintiff's past work. Noting that additional medical evidence would be subsequently admitted into the record, the ALJ determined not to pose hypothetical questions to the vocational expert until

such time as all evidence was received. Upon receipt of such additional evidence, the ALJ reviewed the complete record and determined that Plaintiff was able to perform his past relevant work as a waiter's helper as such work is defined in the *Dictionary of Occupational Titles* (DOT) at No. 318.687-010. The ALJ therefore determined that additional vocational expert testimony was not necessary. Based on her finding that Plaintiff could perform his past relevant work, the ALJ terminated the sequential evaluation process at Step 4 and found Plaintiff not disabled.

Plaintiff claims that the ALJ's determination that he can perform his past work as a waiter's helper is flawed inasmuch as his RFC limits him to only occasional interaction and thus precludes the performance of this work as he performed it. Plaintiff also argues that the ALJ failed to provide any rationale to support his conclusion that he could perform this past work and, further, that he experiences such significant non-exertional limitations that he should have been allowed to cross-examine the vocational expert in order to explore whether any work was available for a person with his limitations. For the following reasons, Plaintiff's claims fail.

As set forth above, the ALJ thoroughly discussed all the evidence of record and formulated an RFC that was based upon and supported by substantial evidence on the record as a whole. When considering Plaintiff's past relevant work as a waiter's helper, the ALJ expressly referred to the specific job description in the DOT that is associated with such past work and compared the demands of this work with Plaintiff's RFC. (See R. at 19.) This

process satisfied the ALJ's duty to compare Plaintiff's RFC with the physical and mental demands of his past relevant work as required by the Regulations. See **Young v. Astrue**, 702 F.3d 489, 491-92 (8th Cir. 2013).

To the extent Plaintiff claims that the DOT description of waiter's helper demonstrates that the level of interaction required for such work exceeds his RFC limitation to only occasional interaction, a review of the DOT description shows the contrary. In her RFC assessment, the ALJ restricted Plaintiff to only occasional interaction with supervisors, coworkers, and the public.[8] As defined in the DOT, the level of interaction designated for the job of waiter-helper is "not significant" and is rated at a Level 8. See DOT No. 318.687-010, 1991 WL 672755. Level 8 interaction requires: "Taking Instructions-Helping: Attending to the work assignment instructions or orders of supervisor. (No immediate response required unless clarification of instructions or orders is needed.) Helping applies to 'non-learning' helpers." DOT, Appendix B, 1991 WL 688701. This designated level of interaction is compatible with an RFC limiting a claimant to only occasional contact with coworkers, supervisors, and the public. See e.g., **Arsenault v. Astrue**, 2009 WL 982225, at *3 (D. Me. 2009) (citing cases) (level of interaction denoted as "not significant" in DOT compatible with limitation to no significant or no more than occasional interaction with public, co-workers, and supervisors). Consequently, it cannot be said that working in this

---

[8]To engage in an activity "occasionally" means less than frequent in that the activity or condition exists up to one-third of the time. See **Owens v. Colvin**, 727 F.3d 850, 851-52 (8th Cir. 2013).

job where interaction is rated at a Level 8 and is considered "not significant" by the DOT would require Plaintiff to exceed the RFC limitation that he have only occasional contact with supervisors, coworkers, and the public. Although Plaintiff contends that the job as he previously performed it required a greater level of interaction, a claimant will be found not to be disabled where he has the RFC to "do either the specific work previously done or the same type of work *as it is generally performed in the national economy*[.]" **Lowe v. Apfel**, 226 F.3d 969, 973 (8th Cir. 2000) (emphasis added). The description of a job provided in the DOT can be relied upon to define the job as it is usually performed in the national economy. SSR 82-61, 1982 WL 31387, at *2 (Soc. Sec. Admin. 1982).

The ALJ therefore did not err in finding Plaintiff able to perform his past relevant work as a waiter's helper as such work is defined in the DOT. Because testimony from a vocational expert is required only when a claimant demonstrates that he cannot perform his past relevant work, **Roe v. Chater**, 92 F.3d 672, 675 (8th Cir. 1996), the ALJ did not err by not obtaining additional vocational expert testimony in this matter.

### Conclusion

When reviewing an adverse decision by the Commissioner, the Court's task is to determine whether the decision is supported by substantial evidence on the record as a whole. **Davis v. Apfel**, 239 F.3d 962, 966 (8th Cir. 2001). "Substantial evidence is defined to include such relevant evidence as a reasonable mind would find adequate to support the Commissioner's conclusion." **Id.** Where substantial evidence supports the Commissioner's

decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently. **Id.**; see also **Buckner**, 646 F.3d at 556; **Gowell v. Apfel**, 242 F.3d 793, 796 (8th Cir. 2001).

As discussed above, a reasonable mind can find the evidence of record sufficient to support the ALJ's determination that Plaintiff was not disabled. Because substantial evidence on the record as a whole supports the ALJ's decision, it must be affirmed. See **Davis**, 239 F.3d at 966. This Court may not reverse the decision merely because substantial evidence exists that may support a contrary outcome. Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and this case is DISMISSED.

An appropriate Order of Dismissal shall accompany this Memorandum and Order.


/s/ ThomasC. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE


Dated this 3rd day of December, 2014.